FILED

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA** 2018 JUL 20  PM 3:05
**ORLANDO DIVISION**

US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

Case No. 6:18-CV-1172-ORL-37-TBS

WILMA PEREZ, an individual,

     Plaintiff,

    v.

FCA US, LLC. f/k/a Chrysler Group LLC

     Defendant.

---

### CLASS ACTION COMPLAINT FOR DAMAGES

Plaintiff WILMA PEREZ alleges as follows:

### INTRODUCTION

1.    Plaintiff brings this class action on behalf of themselves and all current and former owners and lessees of any Chrysler vehicle equipped with an Active Head Restrain system ("Class Vehicles" or "Vehicles") who reside in the State of Florida.  The Defendant, FCA US LLC (formerly known as Chrysler Group LLC and referred to herein as "Chrysler" or "Defendant") sold and leased the Vehicles without first informing its customers that the Vehicles had a critical safety defect associated with the materials used in its Active Head Restraint ("AHR") system and that this defect poses a safety risk to individuals driving these Vehicles.  Specifically, the AHR systems in the Class Vehicles are designed to restrain a passenger's head during a rear end collision.  The system is located within the headrest and two springs located inside the headrest force the front of the headrest to quickly move forward during a rear end collision.  The intent of the system is to prevent the head from whipping back during a rear end collision.  Unfortunately for Plaintiff, and potentially thousands of other individuals, the

headrests in the Class Vehicles are prone to abruptly deploy even when the car is not involved in a collision and while it is being operated under normal driving conditions. When this occurs, the headrest suddenly, unexpectedly, and forcefully strikes the driver in the back of the head. The force of premature deployment cannot only cause serious head injuries to drivers and passengers but also poses a significant safety risk to the public when the headrest unexpectedly deploys while the Class Vehicle is being driven under normal operating conditions on the highway. The malfunction of these AHR systems is a widespread problem. The National Highway Transportation Administration ("NHTSA") has received more than 100 complaints where the AHR system in Chrysler Vehicles has unexpectedly deployed. In many of these cases, the drivers reported injuries to their head, face, and neck. In other cases, the driver was driving their vehicle when the headrest deployed and reported near collisions. No similar complaints exist for other vehicles equipped with AHR systems.

2.      Inspection of the headrests has revealed that the reason they are malfunctioning is that a critical bracket in the system is made from an inferior plastic material that is prone to cracking. When the plastic bracket fails, this causes the headrest to suddenly and unexpectedly shoot forward. There is no way to predict when the bracket will fail.

3.      At all times, Chrysler knew or should have known that its AHR system was manufactured with substandard and inappropriate materials such that it was prone to spontaneously deploy and cause potential injury. Despite this knowledge, Chrysler refuses to accept responsibility for the problem or warn consumers. In fact, Chrysler routinely blames the consumer and refuses to cover the cost of repairs, which often exceeds $800.

4.      Chrysler's conduct constitutes a breach of the implied warranty of merchantability, breach of express warranty, and a violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* Through this action, Plaintiff seeks to 1) obtain a refund for all consumers who incurred out-of-pocket expenses associated with repairs related to the unexpected deployment of their AHR system, 2) obtain damages associated with the loss of the benefit of the bargain, and/or 3) obtain an injunction ordering Chrysler to notify Class

members about this potential safety issue so that they can take appropriate actions to prevent the risk of harm and injury.

## I.

## JURISDICTION AND VENUE

5.     The Court has original jurisdiction over this class action pursuant to 28 U.S.C. § 1332 and the Class Action Fairness Act ("CAFA").  Plaintiff and many other members of the putative Class are residents and citizens of states different from the countries and home states of the Defendant.  More specifically, Plaintiff and Class members are Florida residents whereas Defendant is a resident of Michigan.  Plaintiff is informed and believes, and based thereon alleges, that the amount in controversy in this case, exclusive of interest and costs, exceeds $5,000,000.

6.     Venue is proper pursuant to 28 U.S.C. § 1391 in that Plaintiff Perez resides in this judicial District, purchased her Chrysler vehicle in this District, and her AHR system failed in this District.  In addition, Defendant does substantial business in this judicial District, has received substantial benefit from doing business in this judicial District, and has knowingly engaged in activities directed at consumers in this judicial District.  Furthermore, a significant number of Defendant's customers are Florida residents, and the wrongful acts alleged herein have affected members of the putative Class throughout Florida.  Florida has a significant contact or aggregation of contacts to the claims at issue herein in that Chrysler promotes, markets, and sells the Vehicles at issue in Florida.  Defendant is subject to personal jurisdiction in the State of Florida and in this judicial District.  This Court has jurisdiction over the Defendant identified herein because they are individuals, associations, or corporations that are either authorized to conduct or, in fact, do conduct substantial business in this District.

## II.

## PARTIES

7.     Plaintiff Wilma Perez was at all relevant times, an individual that resided in Orange County, Florida.

8.     Defendant FCA US LLC is a Delaware limited liability company with its principal place of business in Auburn Hills, Michigan.  FCA US is the U.S. subsidiary of Italian multinational automaker Fiat, S.p.A.  FCA US LLC is formerly known as Chrysler Group LLC.  FCA US is in the business of designing, testing, manufacturing, selling, and supporting the Vehicles that are the subject of this complaint.  FCA US does business nationwide.  For the remainder of this complaint FCA US LLC is referred to as "Chrysler" or "Defendant."

## III.

## FACTUAL ALLEGATIONS

9.     In promotional materials and advertising, Chrysler repeatedly touts that it is dedicated to safety with respect to the design and manufacture of its Vehicles.  For example, in the brochures for Jeep Cherokees, Chrysler proclaims that these Vehicles have "over 70 available safety and security features" and that "beneath the surface of the Jeep Grand Cherokee lies a work of safety . . . systems that give you confidence behind the wheel and help protect you and your passengers."  In advertising for its Chrysler 300, Defendant asserts that these Vehicles have 80+ standard and available safety features" and are "Equipped to Protect."  The brochure for its Town and Country Vehicles states that Chrysler's "care for future generations meet your safety standards."

10.     One of the critical safety features of the Class Vehicles is the AHR system, located within the passenger and driver-side headrests.  The system is designed to help prevent or reduce injuries to the Vehicle driver and front-seat passenger in the event the Vehicle is involved in a rear end collision.  The passenger and driver-side headrests of the Class Vehicles are split into two pieces (the front and back).  The padded front of the headrest is spring loaded and is designed to rapidly extend forward to minimize the gap between the back of the Vehicle occupant's head and the headrest.  The front section of the headrest is purportedly held in place before a collision by a short metal rod situated inside a plastic bracket.  This metal rod is then "latched" into two metal hooks that are located on the back of the headrest.  The hooks are attached to a sensor.  When the Vehicle is involved in a rear end collision, the sensor triggers the

hooks on the back of the headrest and then the front of the head rest (which is spring loaded) quickly moves forward. The system is designed to protect the passenger's head from whipping back during a rear end collision.

11.     Unfortunately, the AHR system in the Class Vehicles have a common critical problem with respect to the materials used to manufacture them. Specifically, the plastic bracket that restrains the metal rod on the front of the headrest-and which is subject to substantial and persistent stress and tension-is made from inferior materials and, as a result, is prone to deterioration, cracking, and/or breaking. When the plastic bracket fails, the metal restraining rod is yanked from its position causing the headrests to suddenly and unexpectedly deploy even when the Vehicle is not involved in a collision. It is impossible to know when this will happen and such incidents occur even when the Vehicle is being driven during normal operation on the highway.

12.     Despite Chrysler's performance and safety claims, as described above, the Class Vehicles present a safety hazard and are unreasonably dangerous to consumers because of the potential for an unexpected AHR deployment during normal operation when a Vehicle is not involved in a collision. As a result, the Vehicles are unsafe to drive. Worse, the activated headrest cannot be reset after it fails, further nullifying any safety benefit that the AHR system might have provided in the event of a collision after it has already injured or potentially injured the Vehicle's driver or passenger.

13.     The existence of the defect in Class Vehicles would be considered material by a reasonable consumer deciding whether to purchase or lease a Vehicle. Had Plaintiff and Class members known that the Class Vehicles contained the materials defect alleged herein, they would not have purchased or leased the Class Vehicles. As a result of Plaintiff's and Class members' reliance on Chrysler's omissions and/or material misrepresentations, Plaintiff and Class members have suffered ascertainable loss of money and/or property and/or loss in value of their Vehicles.

14.     Reasonable consumers, like Plaintiff and Class members, expect and assume that a vehicle's headrest will not suddenly and unexpectedly deploy and strike them in the head while driving on the highway or under any other normal driving conditions. Plaintiff and Class members would also be reasonable in assuming that Chrysler would not sell or lease vehicles with known safety defects and would disclose any defects to consumers when it learns of them. Further, Plaintiff and Class members would also be reasonable in assuming that Chrysler would not fail to disclose the defects, persistently deny the defects, and charge consumers hundreds of dollars to address the defects.

15.     The problem with the sudden and unexpected deployment of the AHR system is widespread and has potentially impacted thousands of Vehicles. In fact, in just the past three years, there have been approximately 94 complaints submitted to NHTSA concerning AHR malfunctions. In 35 of the cases, Vehicle owners reported that they were driving their Vehicle on a highway when the incident occurred. In 25 cases, Vehicle owners expressly noted that the malfunction was caused by the failure of the plastic bracket within the headrest. In 15 cases, owners reported head, face, or neck injuries caused by the headrest striking the Vehicle's driver or passenger. Many of the reports indicate that Chrysler was expressly advised of the issue yet failed to cover the cost of repair or offer any type of remedy to the consumer. The following are examples of some of those NHTSA complaints:

- 9/2/15 - THE CONTACT OWNS A 2011 DODGE JOURNEY. THE CONTACT STATED THAT WHILE IN PARK, THE DRIVER SIDE SRS ON THE HEAD REST INADVERTENTLY DEPLOYED. AS A RESULT, THE CONTACT SUSTAINED HEAD INJURIES THAT REQUIRED MEDICAL ATTENTION. THE VEHICLE WAS TAKEN TO A DEALER, BUT WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE MANUFACTURER SENT AN INSPECTOR TO INSPECT THE VEHICLE. THE FAILURE MILEAGE WAS 99,000.

- 6/8/15 - THE CONTACT OWNS A 2011 JEEP COMPASS. WHILE DRIVING APPROXIMATELY 30 MPH, THE CONTACT STATED THAT THE DRIVER SIDE HEAD REST SEPARATED. THE HEAD REST STRUCK THE CONTACT'S NECK AND HEAD, CAUSING THE CONTACT TO SUFFER A DISLOCATED NECK. THE VEHICLE WAS TAKEN TO THE DEALER WHERE IT WAS DIAGNOSED THAT

THE HEAD REST PLASTIC BASE SEPARATED DUE TO DEFECTIVE PLASTIC. THE HEAD REST WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED. THE FAILURE MILEAGE WAS 74,519.

- 2/5/17 - WHILE DRIVING IN THE CITY GOING 45MPH THE PASSENGERS HEADREST RESTRAINT SYSTEM RANDOMLY EXPLODED/ACTIVATED, PUSHING MY WIFE'S NECK DRASTICALLY FORWARD.THIS INCIDENT COULD OF CAUSED SERIOUS BODILY INJURIES AS MY WIFE HAS A CERVICAL LAMINECTOMY DUE TO A SPINAL CORD TUMOR. THIS RANDOM EJECTION OF THE HEADRESTRESTRAINT COULD OF ENDED BADLY.WE TOOK THE VEHICLE TO THE DODGE DEALERSHIP WHERE THEY DETERMINED THAT THE PLASTIC LATCH THAT HOLDS THE RESTRAINT IN PLACE WAS BROKEN CAUSING THE RESTRAINT TO ACTIVATE. WE WERE TOLD THAT OUR EXTENDED WARRANTY WOULD NOT COVER THIS MANUFACTURER DEFECT (THAT'S EXACTLY WHAT IT IS, A MANUFACTURER DEFECT). WE PURCHASED THE VEHICLE WITH ONLY 10 MILES ON IT AND SINCE THE VEHICLE NOW HAS 43,000 MILES ON IT THE MANUFACTURERS WARRANTY IS EXPIRED. THIS ISSUE IS TRULY OF GREAT CONCERN AS IT COULD CAUSE SERIOUS INJURIES. I BELIEVE A RECALL SHOULD TAKE PLACE. THIS VEHICLE HAS NEVER BEEN IN ANY TYPE OF ACCIDENT NOR ANY SITUATION THAT WOULD OF CAUSED AND IMPACT TO BRAKE THIS RESTRAINT SYSTEM. I URGE FOR THIS ISSUE TO BE INVESTIGATED AS THROUGH MY RESEARCH I HAVE COME ACROSS MANY DODGE DURANGO OWNERS THAT HAVE EXPERIENCED SIMILAR ISSUES WITH THE RANDOM DEPLOYMENT OF THE HEADREST RESTRAINT SYSTEM.

- 6/24/17 - MY WIFE AND I WERE DRIVING DOWN THE ROAD WHEN THE PASSENGER SIDE ACTIVE HEADREST DEPLOYED. WHEN IT DEPLOYED IT HIT HER IN THE BACK OF THE HEAD AND GAVE HER WHIPLASH. I RESEARCHED IT ONLINE AND IT APPEARS THAT THIS IS A COMMON PROBLEM WITH DODGE VEHICLES. I ATTEMPTED TO RESET THE SPRING LOADED ACTIVE HEADREST TO DISCOVER THAT THE REASON IT HAD DEPLOYED IS BECAUSE THE PLASTIC RETAINING PIN RECEIVER WAS BROKEN. I HAVE ATTEMPTED TO CONTACT DODGE (CASE#32447405) WITH NO RESOLVE. I FEEL LIKE THE HEADREST SHOULD CERTAINLY BE RECALLED. IF AN OLDER PERSON HAD BEEN HIT IN THE HEAD OR IF IT WERE ON THE DRIVERS SIDE OF THE VEHICLE IT MAY HAVE CAUSED SERIOUS INJURY, A CRASH, OR DEATH. I CAN EMAIL PHOTOS UPON YOUR REQUEST. YOUR PURSUIT OF THIS MATTER WOULD BE GREATLY APPRECIATED.

- 3/16/17 - THE DRIVER HEAD REST DEPLOYED WHILE DRIVING ON THE HIGHWAY, STRIKING THE DRIVER IN THE BACK OF THE HEAD, CAUSING MOMENTARY LOSS OF CONTROL OF THE VEHICLE, BUT NO ACCIDENT. THE HEAD REST WILL NOT GO BACK INTO NORMAL NON-DEPLOYED POSITION

AFTER FOLLOWING THE ON-LINE INSTRUCTIONS FOR RE-SETTING THE HEAD REST. AFTER CHECKING ON THE INTERNET FOR OTHER SUCH PROBLEMS OR RECALLS, FOUND THAT CHRYSLER DEALERS REFUSE TO CLASSIFY THIS AS A MANUFACTORING PROBLEM AND WILL ONLY REPAIR THIS PROBLEM AT OWNERS EXPENSE. I SAW THAT MULTIPLE OTHER OWNERS OF THE 2013 TOWN AND COUNTRY ALSO HAD THIS PROBLEM. PLEASE INVESTIGATE THIS PROBLEM, I BOUGHT THIS VEHICLE BRAND NEW FROM A CHRYSLER DEALER.

- 8/14/17 - IN AUGUST 2017 I CAME OUT TO GET INTO THE CAR AND THE DRIVERS SIDE HEADREST . . . DEPLOYED OVERNIGHT. NEXT DAY WE WERE SITTING IN THE CAR WAITING FOR FOOD TO BE DELIVERED AND THE PASSENGER SIDE HEADREST DEPLOYED STRIKING MY DAUGHTER IN THE FACE HARD ENOUGH TO LEAVE A BRUISE. HEADREST WILL NOT RESET AND DEALERSHIP STATES THAT IT IS A MANUFACTURER DEFECT BUT WILL NOT REPLACE THEM. VEHICLE WAS AT 80000 MILES AT THE TIME SO NO LONGER UNDER FULL WARRANTY, BUT THE MANUFACTURER SHOULD HAVE TO REPLACE FAULTY SAFETY EQUIPMENT REGARDLESS.

- 10/16/17 - I WAS PARKED IN MY DRIVEWAY (AS I JUST GOT HOME FROM WORK) TALKING TO MY DAUGHTER AND HER FATHER (WHO WERE PARKED TO MY DRIVERS SIDE GETTING READY TO LEAVE IN ANOTHER VEHICLE) WHEN WE ALL HEARD A LOUD NOISE AND SOMETHING HIT THE SIDE OF MY HEAD VERY HARD. THE ACTIVATED HEAD REST SHOT OPEN FOR NO REASON AT ALL. THE CAR WAS IN PARK AND NOBODY WAS IN THE VEHICLE EXCEPT FOR ME. THERE WAS NO IMPACT OR ANYONE TOUCHING THE OUTSIDE OF THE VEHICLE EITHER. I AM FORTUNATE THAT I WAS NOT DRIVING AT THE TIME THIS HAPPENED AS THIS COULD HAVE CAUSED AN ACCIDENT WITH THE IMPACT OF THE HEADREST HITTING MY HEAD.

- 5/13/17 - PASSENGER SIDE FRONT ACTIVE HEADREST DEPLOYED ON ITS OWN, (NO COLLISION, OR IMPACT) WHILE AT A COMPLETE STOP AT A TRAFFIC LIGHT, SOUNDED LIKE A GUN SHOT, ADULT PASSENGER IS SUFFERING WITH WHIPLASH, AND TERRIFIED TO RIDE IN MY JEEP AGAIN.

- 8/24/17 - MY WIFE WAS DRIVING THE VEHICLE WHEN THERE WAS AN EXPLODING SOUND IMMEDIATELY FOLLOWED BY HIT TO THE BACK OF HER HEAD. SHE IS CURRENTLY IN A LOT OF PAIN FROM HER NECK AND HAS A NICE HEADACHE TO ACCOMPANY IT. THE VEHICLE IS IN MOTION WHEN THE HEADREST DEPLOYED ON IT OWN.

- 3/6/17 - THE ACTIVE HEAD RESTRAINT (HEADREST) OF MY JEEP DEPLOYED WHILE DRIVING DOWN THE HIGHWAY CAUSING ME TO SWERVE INTO THE OTHER LANE. LUCKILY, THERE WEREN'T ANY CARS IMMEDIATELY AROUND ME SO I WAS ABLE TO REGAIN CONTROL AND CONTINUE ON

WITHOUT INJURY. I BELIEVE THIS COULD BE A VERY DANGEROUS DEFECT IN OTHER SITUATIONS. THE ACTIVE HEAD RESTRAINT IS INTENDED TO GO OFF IN A COLLISION TO PREVENT WHIPLASH FROM AIRBAG DEPLOYMENT AS FAR AS I UNDERSTAND. MY VEHICLE WAS NOT IN AN ACCIDENT OR TOUCHED IN ANY WAY, SIMPLY TRAVELING STRAIGHT DOWN THE HIGHWAY. THIS WAS CONFIRMED BY AN INSPECTION AT THE LOCAL JEEP DEALERSHIP.

- 7/26/17 - ON 7/26/17 I WAS DRIVING ON A LOCAL ROAD IN EASTCHESTER NY GOING UNDER 25 MPH WHEN THE HEADREST RESTRAINT DEPLOYED AND INJURED THE BACK OF MY HEAD. WENT TO ER AND NEED TO SEE A SPECIALIST FOR INJURY. CONTACTED DODGE/CHRYSLER AND WAS TREATED LIKE I WAS AT FAULT. LEASE DEALER STEPPED IN AND VERIFIED THERE WAS NO COLLISON. DODGE HAS AN ENGINEER SCHEDULED TO INSPECT IT 7/31/17. WAS TOLD TO GO THROUGH MY INSURANCE FOR INJURIES BUT THERE WAS NO COLLISION!!

- 9/28/17 - WHILE DRIVING ON THE HIGHWAY SOMETHING EXPLODED LOUD INSIDE THE CAR. I SCREAMED AND AT THE FRONT PASSENGER'S SEAT, I SAW MY DAUGHTERS HEAD AND BODY MOVING FORWARD AS SHE WAS IMPACTED BY THE SEAT. THEN I NOTICED THAT THE HEADREST POPPED AND HIT MY DAUGHTER STRONGLY IN THE HEAD. I WENT RIGHT AWAY TO BIG O DODGE 2645 LAURENS RD, GREENVILLE, SC 29607. THE TECHNICIAN LOOKED AT THE HEADREST AND TOLD ME TO MAKE AN APPOINTMENT BECAUSE THEY WERE TOO BUSY. THEY GAVE ME AN APPOINTMENT FOR A WEEK LATER AND ALSO TOLD ME TO CALL CHRYSLER 800-992-1997 TO SEE IF THEY COVER THE PART. I TALKED TO ARIANA GONZALEZ 9:45AM AND SHE SAID SHE WAS GOING TO CALL BIG O DODGE TO VERIFY WHAT CAN BE DONE, BUT SHE NEVER CALLED ME BACK. I CALLED AGAIN CHRYSLER AND TALKED TO JOEL AND HE SAID THEY CAN'T DO ANYTHING ABOUT IT UNTIL THE CAR IS DIAGNOSED. I EMPHASIZED THAT THIS IS REALLY DANGEROUS AND THAT I AM AFRAID THAT THIS HAPPENS TO MY DRIVER'S SEAT WHILE I AM DRIVING. THIS IS A GREAT SAFETY HAZARD. IF THIS EXPLODES IN THE DRIVER'S SEAT WHILE DRIVING IT CAN CAUSE AN ACCIDENT. THIS IS MY DAILY USE VEHICLE AND I NEED THIS TO BE SOLVED RIGHT AWAY, AND PREVENT MANY OTHER PEOPLE USING DOGDE FROM BEING HARMED.

- 7/7/17 - I WAS DRIVING ON THE HIGHWAY AND SUDDENLY I WAS HIT IN THE BACK OF THE HEAD. AT FIRST I THOUGHT I WAS HIT BY ANOTHER CAR BUT I LOOKED AROUND AND THERE WAS NO CARS AROUND. I PULLED OVER AND LOOKED AT MY HEADREST AND IT EXPLODED AND HIT ME IN THE HEAD. I CALLED AND BROUGHT MY CAR IN TO JEEP WHO SAID IT WAS THE ACTIVE HEAD RESTRAINT AND IT IS SET TO GO OFF DURING AN ACCIDENT. I TOLD THEM I WAS NOT IN ANY ACCIDENT. I THEN CALLED JEEP DIRECTLY WHO TOLD ME THEY WOULD INVESTIGATE THE ISSUE AND

THAT I SHOULD LEAVE MY CAR AT JEEP. THAT WAS 3 WEEK AGO. ALL OF MY ATTEMPT TO CONTACT JEEP TO HAVE THEM RECTIFY THE ISSUE AND REPLACE MY HEADREST HAVE GONE NO WHERE. I HAVE NOT RECEIVED ANY CALL BACKS AND EVERY TIME I CALL THEM THEY TELL ME THERE IS NOTHING THEY CAN DO EXCEPT WAIT UNTIL I AM CONTACTED BY JEEP. THIS IS A BIG SAFETY ISSUE AS I COULD HAVE RUN OFF THE ROAD AN[D] CRASHED.

- 1/27/18 - I WAS COMING TO A GRADUAL STOP AT A TRAFFIC LIGHT ON A LOCAL ROAD WHEN THE ACTIVE HEAD RESTRAINT SEEMINGLY DEPLOYED. I WAS NOT IN A COLLISION AND THERE WAS NO REASON FOR IT TO DEPLOY. UPON EXAMINING THE MECHANISM IT WAS NOT TRIGGERED, RATHER IT FAILED BECAUSE THE PLASTIC CLIPS THAT HELD ONTO THE LATCH HAD BROKEN OFF INTERNALLY CAUSING THE HEADREST TO HIT ME VIOLENTLY IN THE BACK OF THE HEAD. THIS COULD HAVE BEEN FAR WORSE HAD I NOT BEEN ALMOST AT A COMPLETE STOP.

- 1/21/18 - DRIVER'S HEADREST DEPLOYED DUE TO THE PLASTIC THAT HOLDS A PIN BROKE INTERNALLY. THIS SPRING LOADED SYSTEM APPARENTLY HAD ENOUGH TENSION THAT IT BROKE THE PLASTIC. MY VEHICLE WAS STATIONARY AND UNOCCUPIED AT THE TIME. IF I HAD BEEN SITTING IN THE VEHICLE MY NECK COULD HAVE BEEN BROKEN. A REPLACEMENT HEADREST IS ABOUT $650, NOT INCLUDING LABOR, ACCORDING TO THE DEALERSHIP AND I WAS TOLD IT IS NOT IN WARRANTY. I HAVE HAD THIS VEHICLE LESS THAN 4YRS.

- 7/1/17 - THE PASSENGER SIDE SAFETY HEADREST DEPLOYED WHILE DRIVING FULL SPEED DOWN THE INTERSTATE. APPROX. 75 MPH. THE SOUND WAS SO SUDDEN IT STARTLED ME AND ALMOST CAUSED ME TO WRECK. NOW THE HEADREST WILL NOT "POP" BACK INTO POSITION AS DOCUMENTED BY DODGE LEAVING THE HEADREST FULLY DEPLOYED AND COMPLETELY USELESS.

- 11/8/17 - THE ACTIVE HEAD RESTRAINT SYSTEM SUDDENLY DEPLOYED WHILE DRIVING NORMALLY ON CITY STREETS, AND WAS NOT INVOLVED IN A COLLISION OF ANY KIND. PLASTIC RETAINING CLIPS NOW VISIBLE INSIDE THE HEADREST APPEAR TO HAVE FAILED, PREVENTING RESETTING.

- 
- 10/31/17 - THE ACTIVE HEAD REST FOR MY 2014 JEEP GRAND CHEROKEE HAD SPONTANEOUSLY DEPLOYED WHILE PARKED IN MY GARAGE. I HAD TAKEN IT TO THE DEALER FOR REPAIR AND I WAS TOLD THE PLASTIC CLIPS WERE BROKEN AND IT COULDN'T BE RESET AND THE HEAD REST NEEDED TO BE REPLACED AT MY EXPENSE. APPARENTLY THIS IS NOT A VEHICLE RECALL ISSUE BUT POSSIBLY SHOULD BE LOOKED INTO AS ONE.

I HAVE FOLLOWED UP THIS TYPE OF ISSUE ON THE INTERNET AND FOUND MULTIPLE CASES WITH SIMILAR OR THE EXACT TYPE OF ISSUE. THIS POSES A HUGE SAFETY HAZARD, IF I HAD BEEN DRIVING, AND THE HEADREST DEPLOYED IN THIS MANNER IT COULD HAVE CAUSED A SERIOUS ACCIDENT.

- 8/1/17 - ACTIVE HEADREST ACTIVATED BY ITSELF WITH NO COLLISION. INSPECTION REVEALED A PLASTIC TAB IS BROKEN. THIS IS KNOWN BY JEEP AS A DEFECTIVE PIECE OF EQUIPMENT. THEY REFUSED TO FIX AS THE CAR IS ~1500MILES OUTSIDE OF WARRANTY.

- 5/1/17 - THE VEHICLE WAS STATIONARY AND PARKED, BUT STILL RUNNING. THE FRONT PASSENGER SEAT WAS UNOCCUPIED AND THERE WAS A LOUD POPPING SOUND AS THE FRONT PASSENGER SEAT HEADREST "EXPLODED." A COUPLE OF PLASTIC PIECES FLEW OUT. THERE WAS NO REASON FOR THE HEADREST TO DEPLOY. I TOOK THE CAR TO THE JEEP DEALER AND THEY SAID THE HEADREST WAS "DEFECTIVE" BUT COULDN'T DO ANYTHING ABOUT IT AS THE CAR WAS NO LONGER UNDER WARRANTY, NOR IS THERE A RECALL FOR THE PROBLEM. THE CAR HAD UNDER 50K MILES ON IT AND WAS UNDER TWO YEARS OLD, AND HAD NEVER BEEN IN AN ACCIDENT.

- 9/9/17 - DRIVING ON HIGHWAY CAR IN MOTION WHEN PASSENGER HEADREST DEPLOYED HITTING PASSENGERS HEAD PUSHING THEM INTO DASHBOARD. TAKEN TO ADDYS DODGE AND WAS TOLD IT WAS BROKE AND NEEDED A NEW HEADREST FOR $790.00 THAT HEADREST WAS NOT UNDER WARRANTY AND ASKED FOR $ 98.00 FOR THE[IR] INSPECTION.

- 9/27/17 - I WAS WONDERING IF A SAFETY DEVICE IN A CAR HEADREST, DESIGNED TO JUMP FORWARD IN A REAR END COLLISION, IS A SAFETY DEVICE THAT FALLS UNDER WARRANTY. MY WIFE HAD ONE THAT MALFUNCTIONED IN HER 2014 CHRYSLER 200. THERE WAS NO REAR END COLLISION. SHE STOPPED AT AN INTERSECTION IN A MALL PARKING LOT. THE HEADREST DEPLOYED, THROWING HER FORWARD INTO THE STEERING WHEEL. CHRYSLER IS SAYING THAT SINCE HER CAR IS NO LONGER UNDER WARRANTY SHE WILL HAVE TO PAY FOR THE REPLACEMENT OF THIS FAULTY PART. MODELS UP TO 2013 WERE RECALLED FOR THE SAME . . . IN THE HEADRESTS, BUT 2014 WERE NOT RECALLED.

- 9/8/17 - AFTER MAKING A LEFT TURN AT AN INTERSECTION, THE PASSENGER SIDE ACTIVE HEADREST DEPLOYED. NO OTHER SAFETY SYSTEMS ACTIVATED, AND NO WARNING LIGHTS APPEARED ON THE DASH. THE DRIVER-SIDE HEADREST DID NOT DEPLOY. SPEED WAS LESS THAN 30 MPH. LOOKING AT THE HEADREST, IT APPEARS THAT THE PLASTIC CLIPS THAT HOLD IT IN PLACE FAILED, CAUSING THE

DEPLOYMENT. SEE THE ATTACHED PHOTOGRAPHS. THE VEHICLE HAD 38,402 MILES AT THE TIME OF THE INCIDENT.

- 6/20/17 - MY DRIVER SIDE HEADREST DEPLOYED ON ITS OWN WHILE DRIVING DOWN THE ROAD. THE VEHICLE HAS NEVER BEEN IN AN ACCIDENT AND IT IS ONLY 3 YEARS OLD. THE DEPLOYMENT ALMOST CAUSED ME TO WRECK BUT I WAS ABLE TO MAINTAIN MY VEHICLE TO COME TO A STOP IN THE OTHER LANE. I HAVE CONTACTED THE DEALER AND DODGE WITH NO HELP. THE[IR] EQUIPMENT MALFUNCTION AND I HAVE TO PAY $684 TO HAVE IT REPAIRED. KEEP IN MIND IT IS SUPPOSE TO DEPLOY IN A REAR END COLLISION AND THERE WAS NO COLLISION. IT WAS A SPONTANEOUS DEPLOYMENT.

- 5/21/17 - 2015 GRAND CARAVAN MY WIFE MICHELLE O'CONNELL DRIVE IN PULLING INTO OUR DRIVEWAY AND THE HEADREST RESTRAINT SYSTEM AIRBAG DEPLOYED STRIKING MY WIFE IN THE BACK OF THE HEAD VAN WAS TOWED TO BLACK CHRYSLER DODGE RAM IN STATESVILLE NORTH CAROLINA TO BE REPAIRED MY WIFE SOUGHT MEDICAL ATTENTION CHRYSLER THEN DEMANDED THE VEHICLE BE INSPECTED BY AN INDEPENDENT INSPECTOR TO SEE IF IT WAS IN AN ACCIDENT AFTER THE REPORT WAS DONE IN RECEIVED CHRYSLER NOTIFY THE DEALER DO NOT TOUCH THE VEHICLE THE REPORT SAID THE VEHICLE WAS FLAWLESS WHICH WE KNEW THAT THEN CHRYSLER'S LAWYER CONTACTED US AND SAID WE ARE NOT FIXING YOUR VEHICLE UNTIL YOU SIGN PAPERWORK ABSOLVING US OF ANY LIABILITY WHICH THEY KNOW THEY'RE LIABLE CUZ THE VAN IS IN PERFECT CONDITION WE ARE REPORTING THIS BECAUSE WE BELIEVE THERE IS A KNOWN DEFECT BY CHRYSLER AND THEY'RE TRYING TO SWEEP IT UNDER THE RUG THEY HAD A SIMILAR INCIDENT WHERE THEY HAD TO RECALL 880000 VEHICLES IN 2013 FOR THE EXACT SAME ISSUE CHRYSLER MADE OF DIRECT THREAT SAYING WE'RE NOT GOING TO FIX YOUR VEHICLE AND LEAVE IT ON REGISTERABLE BECAUSE OF THE AIRBAG FOR INSPECTION AND UNUSABLE UNLESS YOU ABSOLVE US OF LIABILITY THE VEHICLE WAS ONLY TRAVELING LESS THAN 2 MILES AN HOUR PULLING INTO OUR DRIVEWAY IT WAS A DRIVER'S SIDE HEADREST RESTRAINT AT DEPLOYED.

- 5/2/17 - THE ACTIVE HEADREST/HEAD RESTRAINT DEPLOYED WHILE DRIVING, HITTING MY WIFE IN THE BACK OF THE HEAD. SHE WAS TRAVELING APPROXIMATELY 30-35MPH. THIS CAUGHT HER OFF GUARD BUT FORTUNATELY DID NOT AFFECT HER DRIVING AND SHE MAINTAINED CONTROL OF THE VEHICLE. THE VEHICLE WAS NOT INVOLVED IN AN ACCIDENT. AFTER INSPECTING THE HEAD RESTRAINT I NOTICED THE PLASTIC THAT APPARENTLY HOLDS A METAL ROD BROKE ALLOWING THE HEAD RESTRAINT TO DEPLOY. IN RESEARCHING THE ACTIVE HEAD RESTRAINT ISSUES, I RAN ACROSS A RECALL FOR CHRYLSER BUT IT DID NOT PERTAIN TO MY MAKE AND MODEL AND IT WAS FOR POSSIBLE NON

DEPLOYMENT DURING REAR END COLLISION. SAFETY RECALL N38 /NHTSA 13V-282 ACTIVE HEAD RESTRAINTS

- 4/27/17 - THURSDAY EVENING MY HUSBAND WAS BACKING OUT OF OUR GARAGE AT OUR HOUSE. WHEN HE GOT TO THE STREET (A RESIDENTIAL ROAD) HE PUT THE CAR INTO DRIVE AND THAT'S WHEN THE DRIVER'S HEADREST DEPLOYED (SEPARATED FROM THE PLASTIC PIECE LIKE AN AIRBAG, HEADREST RESTRAINT ACTIVATION THING) HITTING MY HUSBAND IN THE BACK OF THE HEAD FORCEFULLY. HE DID NOT HIT ANYTHING OR RUN OVER ANYTHING WHILE BACKING OUT. NO OTHER AIRBAG DEPLOYED IN THE CAR, JUST THAT ONE. HE PULLED BACK INTO THE GARAGE AND TOLD ME WHAT HAPPENED. WE GOT ON CHRYSLER'S MOPAR WEBSITE TO SEE IF THERE WERE ANY RECALLS REGARDING THAT PART. THERE WERE NO CURRENT RECALLS ON OUR VEHICLE AND WE WERE UP-TO-DATE WITH ALL THE RECALLS ON OUR VEHICLE. WE CONTACTED CHRYSLER SEVERAL TIMES AND GOT NOWHERE WITH THEM, BUT THE FIRST REPRESENTATIVE WE TALKED TO DID GIVE US A CASE NUMBER. THEY ARE BASICALLY SAYING IT IS OUT OF THEIR HANDS AND IN THE DEALERSHIPS. WE THEN CONTACTED THE DEALERSHIP WHERE WE PURCHASED AND SERVICE OUR JEEP. THEY TOLD US TO HAVE IT TOWED THERE AND THEY WILL INSPECT THE PROBLEM. EVEN IF THEY FIX THE PART OR RESET THE AIRBAG THING, I AM STILL SCARED TO DRIVE MY CAR TO AND FROM WORK AND TRANSPORT MY CHILD.

- 9/26/16 - ON SEPTEMBER 26 2016, THE DRIVER'S SIDE HEADREST EXPLODED AND CAME LOSE (FOR NO APPARENT REASON). EXPERIENCING HEADACHE DUE TO THE BUMP ON MY HEAD. DESPITE THE VEHICLE BEING ONLY THREE YEARS OLD, AND WITH JUST 56000 MILES, THE RADIATOR AND AIR CONDITIONING SYSTEMS HAVE BEEN REPLACED! 2013 DODGE AVENGER IS NOT A SAFE CAR TO DRIVE AND NEEDS TO BE THOROUGHLY INVESTIGATED FOR QUALITY AND SAFETY. THE HEADREST EXPLOSION HAPPENED WHILE THE ENGINE WAS OFF AND WAS ABOUT TO EXIT THE VEHICLE INSIDE MY GARAGE.

- 7/31/16 - ON 7/31/2016 MY VEHICLE WAS PARKED IN A DRIVEWAY. I ENTERED THE VEHICLE, STARTED THE ENGINE AND THE DRIVER SIDE ACTIVE HEADREST DEPLOYED. ATTEMPTS TO RESET HEADRESTPER THE OPERATORS MANUAL FAILED. ON 8/4/2016 I TOOK THE VEHICLE TO THE DEALERSHIP WHO INFORMED ME THAT THEY COULD NOT RESET HEADREST AND IT HAD TO BE REPLACED (COST APPROX $900). I CONTACTED DODGE CUSTOMER SERVICE WHO HAS ASSIGNED AN INVESTIGATOR TO LOOK INTO THE ISSUE. CASE # 29846962 AS OF THIS DATE, 8/5, THE REPLACEMENT HEADREST IS ON ORDER AND I AM WAITING TO BE CONTACTED BY THE INVESTIGATOR TO LOOK AT THE VEHICLE. PRIOR TO THE INCIDENT, THE VEHICLE HAD BEEN DRIVEN IN EXCESS OF 500 MILES (NORTHERN VA TO TN) AND HAD BEEN PARKED AND SECURED

IN THE DRIVEWAY FOR APPROX. 1 HOUR. THE VEHICLE WAS NOT, AND HAS NEVER BEEN, IN AN ACCIDENT.

- 8/19/17 - THE PASSENGER SEAT HEAD RESTRAINT SYSTEM ACTIVATED FOR NO KNOWN REASON WHILE DRIVING 70 MPH ON THE INTERSTATE. THE VEHICLE WAS NOT IN ANY ACCIDENT OR NO FACTORS CAUSED THIS. THE HEAD REST VIOLENTLY SHOT FORWARD APPROX 6" IF THIS WOULD HAVE BEEN THE DRIVERS SEAT IT WOULD ALMOST CERTAINLY CAUSED THE DRIVER TO LO[ ]SE CONTROL OF THE JEEP.

- 6/7/17 - WHILE IN PARK, DRIVER WAS LEANING FORWARD TO REACH SOMETHING ON FLOOR WHEN HEAD REST SHOT FORWARD. INSPECTION REVEALED PLASTIC RETAINER HAD BROKEN ALLOWING THE ACTIVE HEAD RESTRAINT TO RELEASE. SAFETY CONCERN IS WHAT IF THIS HAD HAPPENED WHILE DRIVING WITH HEAD NEAR THE HEAD REST?

16.    The Vehicles reporting deployment malfunctions in the NHTSA database include the following Chrysler vehicles:

- Dodge Journey
- Jeep Grand Cherokee
- Jeep Wrangler
- Jeep Liberty
- Jeep Patriot
- Jeep Compass
- Dodge Caravan
- Dodge Grand Caravan
- Dodge Avenger
- Dodge Durango
- Chrysler 200
- Chrysler Town and Country

17.    Despite the obvious defect in the affected Vehicles and Defendant's knowledge of the issue, it continues to use substandard or inadequate plastic material in its AHR system without addressing the problem or disclosing it to their customers.

14

## A.    Chrysler's Warranty

18.    Chrysler's Basic Warranty covers "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

19.    As indicated herein, the plastic used in Chrysler's AHR system is "defective in material" and this defect was present at the time the Class Vehicles "left the manufacturing plant." Despite this, Plaintiff and Class Members were denied coverage for repairs. Rather, Chrysler takes the position that its warranty does not cover the repair or replacement of the AHR system. According to Chrysler, the costs for those repairs should be borne entirely by its customers.

## B.    Chrysler Conceals the Safety Defect from Its Customers

20.    At all material times, the potential harm caused by the defective material used in Chrysler's AHR system was widely known to the Defendant. The Defendant had superior and exclusive knowledge of the materials defect and knew or should have known that the defect was not known or reasonably discoverable by Plaintiff and Class members before they purchased or leased the Class Vehicles.

21.    Plaintiff is informed and believes and based thereon alleges that Defendant acquired its knowledge of the materials defect prior to the time Plaintiff and Class member's purchase or leased the Class Vehicles, including through the numerous consumer complaints and the NHTSA complaints referenced above. In addition, Defendant knew of this materials defect in Vehicles from repair orders and warranty claims from or to Chrysler dealerships. Nevertheless, Defendant actively concealed and failed to disclose and continues to fail to disclose this defect to Plaintiff and the putative Class members at the time of purchase or lease and thereafter.

22.    Chrysler intentionally misrepresented, either affirmatively or by omission, that its Vehicles were free from defects and took no action to adequately warn or remedy the defect, but

instead concealed, suppressed, and failed to disclose the potential damage that could be caused by such materials defects.

23.     In fact, Chrysler systematically, purposefully, and fraudulently concealed the defect and misled customers by telling them that any problems in connection with the defect were actually caused by customers' failure to maintain their Vehicles properly and/or by "tampering."

24.     Despite its awareness and actual knowledge of the materials defect referenced herein and the attendant problems evidenced by, among other things, a significant number of customer complaints, repair orders and warranty claims, Chrysler continues to fail to warn, or even mention, anything about the issue.

25.     Chrysler knew that the defective material in Class Vehicles was causing substantial problems for the putative Class members.  However, upon information and belief, Chrysler has systematically refused to pay for required repairs to putative Class members' Vehicles caused by the materials defect described herein.

26.     While the damages are caused by defective materials in Class Vehicles and while numerous customers have requested that Chrysler remedy and/or address the defects, Chrysler and its agents have failed and/or refused to do so.

27.     To date, Chrysler has failed to warn or inform its customers of the known materials defect and has actively concealed it from Plaintiff and other Class members.

28.     Despite Chrysler's notice of the defect from numerous consumer complaints, dealership repair orders, NHTSA complaints, warranty claims, and other sources, it has not recalled the Class Vehicles to address the defect, has not offered all of its customers suitable repair, remedial measures, modifications, or replacements free of charge, and has not offered to reimburse the Class members who incurred costs relating to the materials defect and subsequent damage to the Class Vehicles.  As a result of Chrysler's conduct alleged herein, Plaintiff and Class members have been harmed and have suffered actual damages as referenced herein.

**D.    The Experience of Plaintiff Perez**

29.    On or about March 25, 2014, Plaintiff Perez purchased a new 2014 Dodge Avenger from a Chrysler dealership in Orlando, Florida.  The Vehicle was purchased and used for personal, non-commercial purposes. Before acquiring the Vehicle, Plaintiff reviewed and relied on Chrysler's various marketing and advertising materials, including material on Chrysler's official website concerning the Vehicle's safety features.

30.    On or about May 20, 2018, Plaintiff was sitting in the driver's seat of her vehicle when the passenger headrest unexpectedly deployed.  At the time of the deployment, Plaintiff was not involved in a collision of any kind.  No other safety equipment in the Vehicle, including the AHR system on the driver's side, deployed during the incident.

31.    Thereafter, Plaintiff attempted to reset the AHR system so that she could drive the Vehicle normally.  When she was unable to reset the system, she brought the Vehicle to her local dealership for repair.  Thereafter, Plaintiff learned that the pin that is used to latch the front of the headrest had been torn out of its plastic bracket which had failed.

32.    Plaintiff asked the dealer to repair the headrest under the vehicle's standard warranty but it refused.  Plaintiff was told that the cost of a new headrest was $563.  Plaintiff has not yet repaired the headrest but will do so shortly.  In the interim, she has purchased "zip ties" in an effort to keep the headrest together and to prevent a deployment of her passenger side headrest.  However, even when plaintiff does obtain a new headrest, she is concerned that it will never be truly "repaired" since she is informed and believes that the AHR system in any new headrest will be made from the same defective materials used in the headrest that malfunctioned and will pose the same safety risks.  Plaintiff is also concerned that the driver's side headrest, which has not yet malfunctioned, also possesses a similar safety hazard.

33.    Had Plaintiff known that his Vehicle was equipped with an AHR system that was manufactured with defective plastic materials and was unsafe to drive, she would not have purchased the Vehicle and/or would have paid significantly less for it.

## TOLLING OF THE STATUTE OF LIMITATIONS

34.    Since the materials defect in the Class Vehicles cannot be detected until the defect manifests, Plaintiff and the Class members were not reasonably able to discover the problem until after purchasing or leasing the Class Vehicles, despite the exercise of due diligence.

35.    Plaintiff and the Class members had no realistic ability to discern the Class Vehicles' materials defect until after the AHR system deployed.  In addition, despite their due diligence, Plaintiff and the Class members could not reasonably have been expected to learn or discover that they were deceived and that material information concerning the AHR system was concealed from them until after the manifestation of the failure.  Therefore, the discovery rule is applicable to the claims asserted by Plaintiff and the Class members.

36.    Moreover, Chrysler is under a continuous duty to disclose to the Plaintiff and the Class members the true character, quality, and nature of the Class Vehicles and the existence of any safety defects.  Chrysler knowingly, affirmatively, and/or actively concealed the true character, quality, and nature of the defect at issue.  Furthermore, Plaintiff reasonably relied upon Chrysler's knowing, affirmative, and/or active concealment.  Based on the foregoing, Chrysler is estopped from relying on any statutes of limitation in defense of this action.

37.    The causes of action alleged herein did or will accrue only upon discovery of the defects referenced herein, Chrysler refusal to cover the repairs of the Class Vehicles, and Chrysler's fraudulent concealment of the defects.  Plaintiff and Class members did not discover and could not have discovered through the exercise of reasonable diligence the true nature of the defects.

## III.

## CLASS ACTION ALLEGATIONS

38.    Plaintiff bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(2) and 23(b)(3) against Defendant on behalf of themselves and the following Class and Breach of Warranty Subclass (collectively, the "Class") defined below.

39.    Plaintiff brings this class action on behalf of himself and the following proposed

Class:

> All persons in Florida who currently own or lease, or who have owned or leased,
> any vehicle manufactured by Chrysler or any of its subsidiaries or affiliates that is
> equipped with an AHR system.

40.    Plaintiff also brings this class action on behalf of the following proposed

Subclass:

> All persons in Florida who currently own or lease, or who have owned or leased,
> any vehicle manufactured by Chrysler or any of its subsidiaries or affiliates that
> is equipped with an AHR system and/or who submitted their Vehicle for repairs
> under the Vehicle's warranty for damage related to the malfunction of the AHR
> system and/or incurred out-of-pocket expenses for such repairs after Chrysler's
> refusal to cover repairs under the Vehicle's warranty.

41.    Subject to additional information through further investigation and discovery, the

foregoing definitions of the Class and Subclass may be expanded or narrowed by amendment or

amended complaint.  Specifically excluded from the Class are Defendant, as well as Defendant's

employees, affiliates, officers, and directors, including franchised dealers, any claims for

physical injuries related to the defect at issue in this litigation, and the Judge to whom this case is

ultimately assigned.  Also specifically excluded from the proposed Class and Subclass are

business entities for purposes of Plaintiff's claims for relief under the California Consumers

Legal Remedies Act, Civil Code section 1750, et seq. ("CLRA").

42.    Numerosity:  Though the exact number and identity of Class members is not

presently known, they can be identified in Chrysler's records through coordinated discovery

pursuant to this class action.  Plaintiff believes that hundreds of thousands of Class Vehicles

equipped with AHR systems have been sold or leased in California.

43.    Commonality and Predominance:  Common questions of fact and law

predominate over any questions affecting only individual members of the Class.  The

predominating common or class-wide questions of fact include the following:

a.  Whether the materials used to manufacture the AHR systems are defective;

b.  Whether the Class Vehicles owners' manuals, written care and maintenance materials, and product labeling sufficiently warn customers about the dangers associated with the Class Vehicles;

c.  Whether the AHR system defect constitutes a safety risk;

d.  Whether Chrysler knowingly failed to disclose and warn consumers of the materials defect with the intent that consumers rely upon such concealment, suppression or omission;

e.  Whether Chrysler had a duty to disclose to consumers material facts concerning the serious problems that would inevitably result from the Vehicles' materials defect;

f.  Whether Chrysler's conduct as alleged herein constitutes a violation of the California Consumers Legal Remedies Act and the California Unfair Competition Law;

g.  Whether Chrysler's refusal to repair Vehicles that have suffered damage constitutes a breach of express warranty; and

f.  Whether Chrysler's sale of the defective Class Vehicles constitutes a breach of the implied warranty of merchantability.

44.  <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the Class members, as all Class members were and are similarly affected by Chrysler's wrongful conduct complained of herein.  Plaintiff and each of the Class members leased and/or owned a Class Vehicle equipped with an AHR system that was manufactured with defective materials such that it causes the Vehicles to be unsafe to drive.

45.  <u>Adequacy</u>:  Plaintiff is adequate representative of the Class because their interests do not conflict with the interests of the Class members they seeks to represent.  Plaintiff has retained counsel highly experienced in the prosecution of complex class action litigation, and

Plaintiff intends to prosecute this action vigorously. Plaintiff and their counsel will fairly and adequately protect the interests of all members of the Class.

46.     Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of the rights of each Class member. Joinder of individual Class members is impracticable. Individual litigation would be unnecessarily costly and burdensome and would deter individual claims. To process individual cases would increase both the expenses and the delay not only to Class members, but also to Defendant and the Court. In contrast, a class action in this matter will avoid case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results and equal protection of the rights of each class member, all by way of the comprehensive and efficient supervision of the litigation by a single court.

47.     This Class may be certified because:

    a.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual members of the proposed Class that would establish incompatible standards of conduct for Defendant;

    b.    The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

    c.    Defendant has acted or refused to act on grounds generally applicable to the Class members, thereby making appropriate final and injunctive relief with respect to Class members as a whole.

## FIRST CAUSE OF ACTION

## (BREACH OF EXPRESS WARRANTY)

48.     Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

49.     As set forth above, the written warranty provided to Plaintiff and the Class specifically provides that Chrysler will cover "the cost of all parts and labor needed to repair any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

50.     As described herein, the Class Vehicles were manufactured with defective material and such defect existed at the time the Vehicles left the manufacturing plant.  Plaintiff and members of the Breach of Warranty Subclass submitted their Vehicles for warranty repairs as referenced herein.  Chrysler failed to comply with the terms of the express written warranty provided to each Class member, by failing and/or refusing to repair the subject materials defect under the Vehicle's warranty as described herein.

51.     Chrysler's acts in failing and/or refusing to repair the materials defect during the warranty period so as to bring the Vehicles into conformity with the express warranties, deprived Plaintiff and members of the Breach of Warranty Subclass of their rights guaranteed them under the express warranties offered by Chrysler.

52.     As a direct and proximate result of the willful failure of Chrysler to comply with its obligations under the express warranties, Plaintiff and members of the Breach of Warranty Subclass have suffered actual and consequential damages.  Such damages include, but are not limited to, the cost of repairing the Vehicles, the loss of the use and enjoyment of the subject Vehicle, and a diminution in the value of the Vehicle containing the materials defects identified herein.  The precise amount of these damages is unknown at the present time but is in excess of the jurisdictional limits of this Court.

## SECOND CAUSE OF ACTION

## (VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, ON BEHALF OF PLAINTIFF AND THE CLASS)

53.     Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully yet forth herein.

54.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* (the "Act"). The standard purpose of the Act is to "protect the consuming public ... from those who engage in unfair methods of competition, or unconscionable, deceptive or unfair acts or practices in the conduct of any trade or commerce. Fla. Stat. § 501.202(2).

55.     Plaintiff and the Class are "consumers" and/or "interested part[ies] or persons" as within the meaning of Fla. Stat. § 501.203, since the subject vehicles were purchased primarily for personal, family, and household purposes. Defendant is engaged in trade or commerce within the meaning of the Act.

56.     Fla. Stat. § 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

57.     Fla. Stat. § 501.204(2) states that "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to [section] 5(a)(l) of the Federal Trade Commission Act." Chrysler's unfair and deceptive practices are likely to misled - and have misled - the consumer acting reasonably in the circumstances, and violate the Act.

58.     Defendant violated the Act by engaging in the unfair and deceptive practices described herein which offended public policies and are immoral, unethical, unscrupulous and substantially injuries to consumers. See Fla. Stat. § 501.204.

59.     Plaintiff and the members of the Class have been aggrieved by Defendant's unfair and deceptive practices. Plaintiff is informed and believes, and thereon alleges, that the acts and

practices described hereinabove, committed in Florida, were intended to result in the sale or lease of motor vehicles to the consuming public, including to Plaintiff. Defendant's acts and practices violated, and continue to violate, the Act in at least the following respects:

      (a) Representing that the vehicles identified hereinabove, have characteristics, uses or benefits they do not have;

      (b) Representing that the vehicles are of a particular standard, quality or grade when they are of another; and,

      (c) Advertising good with the intent not to sell them as advertised.

60.    The business acts and practices of Defendant are unfair, unlawful, and deceptive within the meaning of the Act, in that such acts and practices are deceptive and substantially damaging to consumers and contrary to public policy. Consumers, including Plaintiff, who rely on the representations and warranties made, are injured when Defendant fails to honor the warranty as prescribed herein, and due to the safety concerns that exist in the subject vehicles.

61.    The misrepresentations and omissions outlined herein are material in that they relate to the overall safety and performance of the vehicles and consumers had a full expectation that the subject vehicles would not be equipped with defective AHR and that the vehicles were safe. No consumer would have purchased the subject vehicles if they had been provided true and accurate information about the defects and/or would have paid substantially less for the vehicles. At all times mentioned herein, the defendant had exclusive knowledge of the defects and actively concealed the defects from the public.

62.    Pursuant to the Act, Plaintiff, individually and as representatives of the members of the Class, seeks an order enjoining Defendant from engaging in the unlawful, fraudulent and unfair business practices as alleged pursuant to Fla. Stat. § 501.211. This includes, but is not limited to, repairing the vehicles, such that the vehicles no longer constitute a safety hazard as described herein.

63.    At all times mentioned herein, Plaintiff alleges that Defendant knew that the design of its engine was defective and posed an unreasonable safety risk to the public. With full

knowledge of the facts identified herein, Defendant knowingly sold and continues to sell vehicles equipped with the defect to Florida residents, while concealing and suppressing the nature and scope of the defects.

64.    Pursuant to the Florida Deceptive and Unfair Trade Practices Act, Plaintiff individually and as representatives of the Class, further requests this Court enjoin Defendant from engaging in the unlawful, fraudulent, deceptive and unfair business practices alleged herein and to require Defendant to repay monies acquired by the Defendant during the time Defendant was engaging in unlawful conduct and statutory damages as prescribed by the Act. This includes, but is not limited to, failing and/or refusing to cover repairs and/or replacement of headrests in each of the affected vehicles as identified hereinabove.

65.    Defendant knew or should have known that its acts and practices were unfair or deceptive.

66.    Plaintiff further seeks attorney's fees and costs incurred as a result of bringing this action.

**THIRD CAUSE OF ACTION**

**(BREACH OF THE IMPLIED COVENANT OF**

**GOOD FAITH AND FAIR DEALING)**

67.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

68.    In the course of purchasing and obtaining service for their respective vehicles, Plaintiff and Class members entered into agreements with Chrysler, and/or were otherwise in contractual privity.

69.    The agreements were subject to implied covenants of good faith and fair dealing, requiring that Chrysler conduct business with Plaintiff and the Class members in good faith and deal fairly and justly with them.

70.    Chrysler breached the implied covenants of good faith and fair dealing by selling Plaintiff and Class members vehicles that were equipped with defective AHR systems, by abusing

its discretion in the performance of the sales and service related contract(s), and by intentionally subjecting Plaintiff and the Class members to defects that were known and/or contemplated at the time of purchase. Chrysler further breached the implied covenants of good faith and fair dealing by denying the existence of known, documented, reported defects and problems, and making false statements to avoid service, repair, and replacement obligations.

## FOURTH CAUSE OF ACTION

### (VIOLATION OF THE MAGNUSON-MOSS ACT - EXPRESS WARRANTY)

71.    Plaintiff repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

72.    The Chrysler vehicles that are the subject of this case are "consumer products" as that term is defined by 15 U.S.C. §2301(1).

73.    Plaintiff and Class members are "consumers" as that term is defined by 15 U.S.C. §2301(3).

74.    Chrysler is a "supplier" as that term is defined by 15 U.S.C. §2301(4).

75.    Chrysler is a "warrantor" as that term is defined by 15 U.S.C. §2301(5).

76.    Chrysler provided Plaintiff and Class members with "written warranties" as that term is defined by 15 U.S.C. §2301(6).

77.    Section 15 U.S.C. §2310(d)(l) provides that a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this title, or a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief in any court of competent jurisdiction in any state or in an appropriate District Court of the United States.

78.    Chrysler breached its express warranties by selling vehicles that had defective AHR systems at the time of sale.

79.    Chrysler further breached its express warranties by refusing to replace the defective parts.

80.     In its capacity as supplier, warrantor, and service provider, and by the conduct described herein, any attempt by Chrysler to limit its express warranties in a manner that would exclude or limit coverage for the defective AHR systems is unconscionable and any such effort to disclaim or limit liable for said defects is void.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them jointly and severally, as follows:

1.      For compensatory damages in an amount to be determined at trial;

2.      For restitution to Plaintiff of all funds unlawfully acquired by Defendants by means of any acts or practices declared by this Court to be in violation of Business and Professions Code § 17200 *et seq.;*

3.      For an injunction to prohibit Defendants from engaging in the unfair business practices complained of herein, and for an injunction requiring Defendants to give notice to persons to whom restitution is owing of the means by which to file for restitution;

4.      For punitive damages in an amount to be determined at trial

5.      For reasonable attorney's fees;

6.      For costs and expenses incurred herein; and,

7.      For such other and further relief as the Court may deem just and proper.

Dated: July 18, 2018                **OSBORNE & ASSOCIATES LAW FIRM, P.A.**
                                    Joseph A. Osborne, Esquire
                                    Attorney for Plaintiff
                                    433 Plaza Real, Suite 271
                                    Boca Raton, FL 33432
                                    (561) 293-2600
                                    (561) 923-8100 (fax)

                                    By: */s/ Joseph A. Osborne*
                                        Joseph A. Osborne, Esquire
                                        Florida Bar No.: 880043

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 18, 2018

**OSBORNE & ASSOCIATES LAW FIRM, P.A.**
Joseph A. Osborne, Esquire
Attorney for Plaintiff
433 Plaza Real, Suite 271
Boca Raton, FL 33432
(561) 293-2600
(561) 923-8100 (fax)

By: */s/ Joseph A. Osborne*
Joseph A. Osborne, Esquire
Florida Bar No.: 880043